IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOANNA SPIESMAN,**
on behalf of herself and
all others similarly situated,

          Plaintiff,

v.

**VERDE ENERGY USA, INC.,**

          Defendant.

Case No. 1:20-cv-1543

Class Action

## COMPLAINT

1. Deregulation changed the way electricity is sold to consumers. When utility companies were the sole players in the market, they supplied and distributed electricity to consumers and set the retail rates. Now, consumers can choose from an array of electricity suppliers other than their local utility company.

2. Unfortunately, some unscrupulous electricity suppliers have taken advantage of deregulation. Certain suppliers exploit the lack of regulatory oversight by engaging in deceptive marketing practices and price gouging to profiteer at the expense of unsuspecting consumers. Defendant Verde Energy USA, Inc. ("Verde") is one such supplier.

3. This action arises from Verde's deceptive, bad-faith, unconscionable and unfair pricing practices that have caused thousands of consumers to pay considerably more for electricity than they should have.

4. Verde is a participant in the retail electricity market. Verde purchases electricity supply from the wholesale market and resells that electricity to retail consumers. Verde does not produce electricity and it does not distribute it to consumers.

1

5. In order to lure consumers into purchasing its electricity supply, Verde promises to offer variable rates that will vary based on market conditions.

6. In reality, Verde's variable rates are substantially higher than those otherwise available in the electricity market, and do not reflect wholesale costs or market conditions.

7. As a result, unsuspecting consumers have been fleeced out of millions of dollars in exorbitant charges for electricity.

## PARTIES

8. Plaintiff Spiesman is a citizen of Ohio who resides in Ashtabula, Ohio.

9. Defendant Verde Energy USA, Inc. is a Delaware corporation with a principal place of business in Houston, Texas.

## JURISDICTION AND VENUE

10. The Court has specific personal jurisdiction over Verde because this action arises out of and relates to Verde's contacts with Ohio. Verde sells electricity to consumers in Ohio. Verde advertises and markets within Ohio through sales representatives, through the wires and mails, and via Verde's website.

11. The Court has jurisdiction over this action under 28 U.S.C. § 1332(d), the "Class Action Fairness Act." Minimal diversity of citizenship exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

12. Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Ms. Spiesman's claim occurred here. Specifically, Verde supplied Ms. Spiesman with, and overcharged Ms. Spiesman for, electricity in this district.

**OPERATIVE FACTS**

**History and Structure of Electricity Deregulation**

13.     States across the country began deregulating their retail energy supply markets in the 1990's. For example, in 1999 Ohio passed the Electric Restructuring Act that is now reflected in Ohio Revised Code § 4928.01, et seq.[1]

14.     Deregulation was intended to bring about greater consumer choice, as well as lower rates and more flexibility.[2]

15.     Deregulation enables retail energy supply companies to be more competitive, aggressive, and creative than monopolistic utilities in reducing wholesale purchasing costs, thereby lowering prices for retail consumers. The public policy motivation in Ohio and other states for allowing consumers a choice of energy suppliers is to enable retail consumers to financially benefit from the increased competition between suppliers in the open market by paying lower rates for energy supply.

16.     Through Ohio Revised Code § 4928.01, et seq., Ohio deregulates the electricity generating market to give consumers a choice of competitive retail energy suppliers for their electric energy, including their ability to receive supply from local utilities.

17.     Ohio refers to retail energy suppliers such as Verde as "Electric services compan[ies]"[3]

18.     When consumers choose an electric services company ("ESC") like Verde, the ESC supplies the electricity, while local utilities continue to deliver or distribute electricity to consumers and manage billing. Consumers who choose not to receive electricity supply from

---

[1] *See* Ohio Rev. Code § 4928.01.
[2] *See* Ohio Rev. Code § 4928.02.
[3] Ohio Rev. Code § 4928.01(a)(9).

ESCs generally rely on their local utilities for their energy supply. Local utilities are ESCs' primary competitors.

19. As part of deregulation, ESCs do not have to file or seek approval for their electricity supply rates or their pricing methodologies.

20. Utilities charge their consumers a supply rate called the Standard Service Offer, or SSO. As the Ohio Public Utility Commission explains, "The standard service offer (SSO) is the default rate for generation supply an electric distribution utility charges a customer who decides not to shop. In order to secure electricity for customers on the SSO rate, electric distribution utilities conduct competitive wholesale auctions and the average price of the electricity secured through the auction is the main component of the SSO."[4]

21. Thus, the rates utilities in Ohio charge for electricity supply are reflective of the average rates available in the competitive wholesale market—the same market from which ESCs like Verde can obtain their wholesale electricity. Verde should be able to obtain lower rates for its wholesale purchases.

22. Indeed, unlike heavily-regulated utilities, ESCs have many options to buy electricity at wholesale for resale to retail consumers, including: owning their own electricity production/generation facilities, purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer (the "spot" market); and by purchasing electricity in advance of the time it is used by consumers (the "futures" market).

23. Because of their increased flexibility, ESCs should be able to offer rates competitive with – if not substantially lower than – the local utilities' rates, and many do.

---

[4] *Available at* https://www.puco.ohio.gov/be-informed/consumer-topics/how-are-electric-generation-rates-set/.

24. Indeed, Verde offered fixed rates during the time Plaintiff was a customer that were competitive with Ohio utility rates, and that were substantially lower than its variable rates.

25. There is no good faith justification for charging variable rate customers a rate that is outrageously higher than the rates Verde charges its fixed rate customers. Because Verde is a sophisticated energy company, it can predict with reasonable accuracy the electricity needs of its variable rate customers, and because it can use various sophisticated strategies to purchase electricity for its variable rate customers, its costs for serving variable rate customers and fixed rate customers are not substantially different. The only reason that Verde's variable rates are so much higher than its fixed rates is that it engages in profiteering and price gouging with respect to its variable rate customers, a stark demonstration of its bad faith pricing practices.

26. In fact, at first, when Ms. Spiesman was a customer of Verde, Verde offered fixed rates that were competitive with the incumbent local utility rates.

27. Verde exploits deregulation's lack of regulatory oversight by deceptively charging consumers exorbitant rates. In fact, Verde's rates were substantially higher than rates charged by the other ESCs and local utilities, and they do not reflect its costs to purchase electricity on wholesale markets.

**Ms. Spiesman's Dealings with Verde**

28. Ms. Spiesman's local utility is the Illuminating Company. Ms. Spiesman used the Illuminating Company in conjunction with NOPEC-FirstEnergy Solutions Corp. for electricity service, before switching to Verde.

29. In or about July 2016, Ms. Spiesman signed up for electricity supply with Verde.

30. Before her service began, Verde sent Plaintiff its standard customer agreement. That agreement promised that, once her fixed rate expired, she would be automatically switched

5

over to Verde's variable rate, and the agreement promised that the rate "may change monthly with market conditions." The agreement provided no other information or statement regarding the variable rate.

31. The agreement also provided for a seven day rescission period (which started after the utility sent an enrollment confirmation notice to Plaintiff) during which she could reject or rescind her decision to enroll with Verde.

32. During the rescission period, Verde's customer agreement serves as a solicitation because consumers may "reject" the agreement before it becomes legally binding. The agreement is not legally binding prior to the expiration of the rescission period. Thus, the agreement was an advertisement or solicitation in which Verde identifies the purported market-based pricing methodology for its variable rate.

33. Upon information and belief, Verde's customer agreements in all states in which it operates are materially the same, and they all promise that any fluctuations or changes in the variable rate will be based only on changes in market conditions. Thus, all of Verde's variable rate customer agreements require that the variable rate be reflective of market conditions.

34. Any reasonable consumer, including Plaintiff, would understand that, as with any other market, the electricity "market" consists of two components: (1) the supply side, as reflected in wholesale electricity prices (wholesale costs make up the vast majority of ESCs' costs to provide retail electricity), and (2) the demand side, as reflected in the retail electricity rates offered by Verde's competitors, namely, the local utility (which is the primary competitor in virtually every service territory) and other ESCs (including Verde's own fixed rates).

35. Ms. Spiesman received her first joint invoice from Verde and the Illuminating Company on August 3, 2016.

36. Starting on August 3, 2016, and for approximately 12 months, Ms. Spiesman's initial rate was fixed at 6.49¢ kWh.

37. In August 2017, the rate increased to 8.99¢ kWh. This month marked the beginning of a variable rate that gradually increased until Ms. Spiesman noticed that her electricity rates were far above the market rates and, in or around May 2018, canceled Verde's services.

38. At last billing, Verde was charging Ms. Spiesman 11.99¢ kWh for electricity. This price was more than double that offered by her utility.

39. Verde's variable rates did not reflect wholesale electricity prices and were not competitive with other retail rates. Instead, its variable rates were substantially higher than both wholesale and retail market rates, and did not decrease when wholesale electricity market prices declined.

40. The following table compares Ms. Spiesman's electricity supply rates from April 3, 2016 to May 3, 2018 with the SSO. The shaded rows indicate the dates Verde charged a variable rate.

| Electricity Supplier | Service Period | kWh Usage | Verde's Charge per kWh | "Standard Service Offer" per kWh | Percent Difference |
|---|---|---|---|---|---|
| NOPEC | 4/3/16 to 5/31/16 | 646 | 6.96¢ | 7.4¢ | -5.97% |
| NOPEC | 6/1/16 to 6/29/16 | 673 | 6.02¢ | 6.4¢ | -5.97% |
| Verde Energy | 6/30/16 to 7/29/16 | 721 | 6.49¢ | 6.06¢ | 7.10% |

| Electricity Supplier | Service Period | kWh Usage | Verde's Charge per kWh | "Standard Service Offer" per kWh | Percent Difference |
|---|---|---|---|---|---|
| Verde Energy | 7/30/16 to 8/30/16 | 716 | 6.49¢ | 6.06¢ | 7.10% |
| Verde Energy | 8/31/16 to 9/29/16 | 682 | 6.49¢ | 5.26¢ | 23.38% |
| Verde Energy | 9/30/16 to 10/31/16 | 634 | 6.49¢ | 5.29¢ | 22.68% |
| Verde Energy | 11/1/16 to 11/30/16 | 784 | 6.49¢ | 5.3¢ | 22.45% |
| Verde Energy | 12/1/16 to 1/3/17 | 1041 | 6.49¢ | 5.3¢ | 22.45% |
| Verde Energy | 1/4/17 to 2/2/17 | 910 | 6.49¢ | 5.39¢ | 20.41% |
| Verde Energy | 2/3/17 to 3/3/17 | 517 | 6.49¢ | 5.39¢ | 20.41% |
| Verde Energy | 3/4/17 to 4/4/17 | 820 | 6.49¢ | 5.35¢ | 21.31% |
| Verde Energy | 4/5/17 to 5/3/17 | 619 | 6.49¢ | 5.07¢ | 28.01% |
| Verde Energy | 5/4/17 to 6/2/17 | 793 | 6.49¢ | 5.15¢ | 26.02% |
| Verde Energy | 6/3/17 to 7/5/17 | 829 | 6.49¢ | 6.33¢ | 2.53% |
| Verde Energy | 7/6/17 to 8/2/17 | 830 | 8.99¢ | 6.63¢ | 35.60% |
| Verde Energy | 8/3/17 to 9/1/17 | 860 | 9.49¢ | 6.6¢ | 43.79% |
| Verde Energy | 9/2/17 to 10/4/17 | 733 | 9.49¢ | 5.81¢ | 63.34% |
| Verde Energy | 10/5/17 to 11/2/17 | 604 | 9.49¢ | 5.91¢ | 60.58% |
| Verde Energy | 11/3/17 to 12/5/17 | 813 | 9.99¢ | 5.91¢ | 69.04% |

| Electricity Supplier | Service Period | kWh Usage | Verde's Charge per kWh | "Standard Service Offer" per kWh | Percent Difference |
|---|---|---|---|---|---|
| Verde Energy | 12/6/17 to 1/5/18 | 1027 | 9.99¢ | 5.89¢ | 69.61% |
| Verde Energy | 1/6/18 to 2/5/18 | 845 | 10.49¢ | 5.8¢ | 80.86% |
| Verde Energy | 2/6/18 to 3/3/18 | 642 | 11.49¢ | 5.8¢ | 98.10% |
| Verde Energy | 3/4/18 to 4/4/18 | 1308 | 11.49¢ | 5.77¢ | 99.13% |
| Verde Energy | 4/5/18 to 5/3/18 | 628 | 11.99¢ | 5.58¢ | 114.87% |

41. So as the table above shows, as soon as Ms. Spiesman's fixed rate expired and Verde transitioned her to its variable rate, the rate increased by 38% (from 6.49¢ to 8.99¢) while the Standard Service Offer had increased by only 5% (from 6.33¢ to 6.63¢).

42. Further, Verde continued to hike its monthly rate—slowly and by only 0.5¢ per kWh at a time—until it reached 11.99¢ per kWh.

43. This gradual increase in Plaintiff's variable rate is not reflective of increases in either wholesale or retail costs. Instead, it is reflective of what is known as a "glide path" practice used by unscrupulous ESCs like Verde. ESCs know that sharp increases in rates lead to customer attrition or churn, because customers notice those sharp increases and switch to other ESCs or the utility who do offer market rates. To avoid having customers notice that Verde is engaging in price gouging, it gradually increases the variable rate. Luring consumers into signing up with Verde based on a low initial rate and a promise to charge a market based rate thereafter, followed by gradually increasing the rate, irrespective of market changes, with the expectation that

9

customers would not notice a gradual increase, is an unfair and deceptive practice and reflective of bad faith pricing.

44. As one judge put it in a similar case:

> [Defendant] sucked customers in with an appealing teaser rate only to later jack up the cost when those customers would not notice. The temptation of this siren-like path was no accident. [Defendant] created "glide paths" to ensure customers were lulled into inattentiveness. It ramped up rates for those who were inattentive to begin with. And then it capitalized on its customers' lack of awareness. I am convinced that a jury could reasonably conclude that this pricing practice is unfair.

*Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 106 (2d Cir. 2019) (Pooler, J., dissenting).[5]

45. While Verde was gradually increasing the variable rate it was charging Plaintiff, her former utility was able to reduce its own rate from 6.33¢ to 5.58¢. From June 2017 to May 2018, Verde's rate rose a remarkable 83%, while the utility (whose rates are reflective of costs in the wholesale market) reduced its rate by 13%.

46. The "Percent Difference" column demonstrates the drastic difference between Verde's rates and the SSO as indicated on the Illuminating Company's invoices. In the May, 2018 invoice, the difference between the rates exceeded 100%—meaning that Verde's variable rates were *more than double* the average utility's rates. In no month was the variable rate competitive with the utility rate.

47. The following table identifies the billing periods during which Ms. Spiesman was enrolled in Verde's variable rate, Verde's variable rates for each billing period, and the contemporaneous wholesale market price for electricity available in the PJM area.[6] Verde is

---

[5] While Judge Pooler sat in dissent in *Richards*, the Second Circuit unanimously denied a motion to dismiss another complaint which has nearly identical allegations to Ms. Spiesman's. *Mirkin v Xoom Energy, LLC*, 931 F.3d 173 (2d Cir. 2019). Judge Pooler was a member of that panel.

[6] PJM (or PJM Interconnection) is a neutral, independent party that operates a competitive wholesale electricity market in Ohio and other states in the Northeast.

capable of purchasing electricity at wholesale at these prices, and given that it holds itself out as one of the top suppliers of residential electricity, it likely purchased wholesale electricity at lower costs.

| Electricity Supplier | Service Period | Verde's Charge per kWh | Wholesale Price per kWh |
|---|---|---|---|
| Verde Energy | 7/6/17 to 8/2/17 | 8.99¢ | 4.73¢ |
| Verde Energy | 8/3/17 to 9/1/17 | 9.49¢ | 5.03¢ |
| Verde Energy | 9/2/17 to 10/4/17 | 9.49¢ | 5.09¢ |
| Verde Energy | 10/5/17 to 11/2/17 | 9.49¢ | 5.14¢ |
| Verde Energy | 11/3/17 to 12/5/17 | 9.99¢ | 6.39¢ |
| Verde Energy | 12/6/17 to 1/5/18 | 9.99¢ | 12.15¢ |
| Verde Energy | 1/6/18 to 2/5/18 | 10.49¢ | 4.63¢ |
| Verde Energy | 2/6/18 to 3/3/18 | 11.49¢ | 5.26¢ |
| Verde Energy | 3/4/18 to 4/4/18 | 11.49¢ | 5.82¢ |
| Verde Energy | 4/5/18 to 5/3/18 | 11.99¢ | 5.47¢ |

48. On average, Verde's rates per service period were 85% larger than the wholesale rate for the same period.

49. The cost of wholesale electricity is the primary component of the non-overhead costs Verde incurs. The other cost factors that may affect its variable rate (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in the utility's

11

rates as well. These additional wholesale costs are relatively insignificant in terms of the overall costs Verde incurs to provide retail electricity, and do not substantially fluctuate over time. Moreover, other ESCs incur these costs as well, yet they offer substantially lower rates, just as Verde itself did for its fixed rate offerings.

50. Therefore, these other cost factors cannot explain Verde's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs.

51. Verde represents that it provides a "green" product because it purchases offsetting renewable energy credits for the electricity it supplies consumers. Renewable energy credits are a small portion of the costs Verde incurs and they do not explain the exorbitantly high variable rates it charges. Its fixed rates include renewable energy credits but they are low, and other ESCs offer green products without charging such exorbitant rates. Nor do costs for renewable energy credits fluctuate enough to account for Verde's price increases.

52. Verde's rates are also substantially higher than those of other ESCs, including its own fixed rates.

53. For example, according to the U.S. Energy Information Administration ("EIA"), in 2018 there were 73 ESCs servicing Ohio electricity consumers. Only eight other ESCs had higher rates than Verde. *See* EIA 2018 Retail Power Marketers Sales – Residential (Table 12).[7] In other words, 89% of other ESCs charge rates in 2018 that were lower than Verde's. Many of those ESCs provide green or renewable products.

54. Verde's representation that its rate change only based on market conditions was knowingly false and misleading. Verde knew that its variable rates did not reflect its costs to

---

[7] *Available at* https://www.eia.gov/electricity/sales_revenue_price/pdf/table12.pdf.

procure electricity for its customers, nor did its rates reflect retail electricity prices otherwise available to its customers.

55. No reasonable consumer who knew the truth about Verde's exorbitant rates would choose it as an electricity supplier.

56. Verde induced consumers into purchasing its electricity supply by intentionally misrepresenting its electricity rates as being based on market conditions, when it knew that its rates were unconscionably high. Verde did so to reap outrageous profits at the expense of unsuspecting consumers. Verde acted with actual malice or wanton and willful disregard for the well-being of consumers.

57. Ms. Spiesman was economically injured by Verde's act. Ms. Spiesman, and all similarly situated consumers, would not have contracted with Verde had they known the truth about its variable rates or would not have been willing to pay the price Verde charged.

## CLASS ACTION ALLEGATIONS

58. The following allegations are provided pursuant to Loc. R. 23.1(b).

59. Ms. Spiesman seeks certification of classes under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

60. Ms. Spiesman brings this action on her own behalf and on behalf of the following "Nationwide Class":

> All residential and commercial consumers in the United States who were charged a variable rate for electricity by Verde Energy USA, Inc.
>
> Excluded from the Nationwide Class are: Defendant; any parent, subsidiary, or affiliate of a Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director,

employee, legal representative, predecessor, successor, or assignee of Defendant.

61. Ms. Spiesman also brings this action on her own behalf and on behalf of the following "Ohio Subclass," which is to be considered a subclass of the Nationwide Class:

> All residential and commercial consumers in Ohio who were charged a variable rate for electricity by Verde Energy USA, Inc.
>
> Excluded from the Ohio Subclass is: Defendant; any parent, subsidiary, or affiliate of a Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

62. Ms. Spiesman reserves the right to alter these class definitions as allowed by law.

63. This action is brought as a class action for the following reasons:

   a. All class members are ascertainable because they can be identified by objective criteria: they are persons who contracted with Verde for the generation of residential or commercial electricity. Notice can readily be provided to class members through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B);

   b. Each of the Nationwide Class and Ohio Subclass consist of thousands of persons and are therefore so numerous that joinder of all members, whether otherwise required or permitted is impracticable;

   c. There are questions of law or fact common to each class and subclass that predominate over any questions affecting only individual members, including:

   i. whether Verde breached its promises to charge market rates;

   ii. whether Verde acted deceptively and unfairly by promising to charge market rates;

14

      iii.      whether Verde breached the covenant of good faith and fair dealing by exercising unilateral price-setting discretion in bad faith, *i.e.*, to price gouge or upset the reasonable expectation of consumers that Verde's variable rates would be based on market conditions;

      iv.      whether Ms. Spiesman and class members have sustained damages; and

      v.      whether Verde should be enjoined from continuing to charge exorbitant rates based on factors other than as agreed in the contracts.

d.      The claims asserted by Ms. Spiesman are typical of the claims of all other class members, as Ms. Spiesman's customer agreement was materially the same as other class members' agreements, and Verde uses a uniform method to set the variable rate;

e.      Ms. Spiesman will fairly and adequately protect the interests of class members, and Ms. Spiesman has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCs;

f.      Prosecuting separate actions by individual class members could create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Verde;

g.      Verde has acted on grounds that apply generally to class members, namely representing that its variable rates are competitive, so that final injunction relief prohibiting Verde from continuing its unlawful practices is appropriate with respect to the Nationwide Class and the Ohio Subclass;

h.      A class action is superior to all other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

      i.      Absent a class action, class members as a practical matter will be unable to obtain redress, Verde's violations of their legal obligations will continue without remedy, additional consumers

    will be harmed, and Verde will continue to retain its ill-gotten gains;

  ii. It would be a substantial hardship for most individual class members if they were forced to prosecute individual actions, or such actions simply would not be brought;

  iii. When Verde's liability has been adjudicated, the Court will be able to determine the claims of all class members;

  iv. A class action will permit an orderly and expeditious administration of claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

  v. This action presents no unusual difficulties that would impede its management by the Court as a class action; and

  vi. Verde has acted on grounds generally applicable to the Nationwide Class and the Ohio Subclass making classwide monetary and injunctive relief appropriate.

### Construction

64. This complaint should be construed so as to incorporate all allegations above into each count below.

### Count 1:
### Breach of Contract and
### Breach of the Duty of Good Faith and Fair Dealing
### (Nationwide Class and Ohio Subclass)

65. This count is brought on behalf of Ms. Spiesman, the Nationwide Class, and the Ohio Subclass.

66. Ms. Spiesman and class members were bound by valid contracts with Verde for the provision of electricity supply.

67. Pursuant to the contract, Ms. Spiesman and all class members agreed to pay Verde's rate, and did so.

16

68. However, Verde failed to perform its obligations under the contract, because its rates were not based on market conditions.

69. Ms. Spiesman and class members suffered injury because the variable rates would have been much lower had Verde actually based its rate on market conditions.

70. Inherent in every contract is an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

71. Ms. Spiesman and class members reasonably expected that Verde would attempt to make a reasonable profit in setting rates and selling electricity to consumers. However, Ms. Spiesman also reasonably expected that the variable rate would reflect market conditions and be reflective of retail prices otherwise available to its customers, and that Verde would refrain from price gouging. Without these reasonable expectations, Ms. Spiesman and class members would not have agreed to buy electricity from Verde.

72. Verde breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its rate-setting discretion to price-gouge and frustrate Ms. Spiesman and the members of the Nationwide Class and Ohio Subclass who reasonably expected that the variable rate for electricity would reflect market conditions.

73. As a result of Verde's breaches, it is liable to Ms. Spiesman and class members for damages and attorney's fees.

## Count 2: Unjust Enrichment (Nationwide Class and Ohio Subclass)

74. This count is brought on behalf of Ms. Spiesman and the Nationwide Class and the Ohio Subclass.

75. Ms. Spiesman and class members conferred a tangible economic benefit upon Verde by contracting with Verde for electricity.

76. Ms. Spiesman and class members would not have contracted with Verde for electricity had they known that Verde would charge rates substantially in excess of those charged by other market participants and would not base its rates on the wholesale cost of electricity.

77. By engaging in the conduct described above, Verde unjustly enriched itself and received a benefit beyond what was contemplated by the parties, at the expense of Ms. Spiesman and class members.

78. It would be unjust and inequitable for Verde to retain the payments Ms. Spiesman and class members made for excessive electricity charges.

79. Therefore, Verde is liable to Ms. Spiesman and class members for damages that they have suffered as a result of Verde's actions.

## PRAYER FOR RELIEF

Ms. Spiesman respectfully asks the Court to enter judgment against Verde as follows:

1. Ordering appropriate injunctive relief;

2. Certifying this action as a class action as defined above;

3. Awarding damages as demanded in each Count, including compensatory damages, exemplary damages, attorney fees and costs, and pre- and post-judgment interest; and

4. Awarding Ms. Spiesman and the Nationwide Class and Ohio Subclass members such other and further relief as this Court deems just and proper.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Ms. Spiesman demands that a jury determine any issue triable by a jury.

Dated: July 13, 2020    Respectfully submitted,

/s/ William F. Cash III

William F. Cash III (Ohio Bar No. 84482)
Matthew D. Schultz (*pro hac vice motion forthcoming*)
Brenton J. Goodman (*pro hac vice motion forthcoming*)
**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone: 850-435-7059
Email: bcash@levinlaw.com
Email: mschultz@levinlaw.com
Email: bgoodman@levinlaw.com

/s/ D. Greg Blankinship

D. Greg Blankinship (*pro hac vice motion forthcoming*)
**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**
445 Hamilton Ave, Suite 605
White Plains, NY 10601
Phone: 914-298-3290
Email: gblankinship@fbfglaw.com

*Attorneys for Joanna Spiesman*